Laura Van Note, Esq. (S.B. #310160)
Mark T. Freeman, Esq. (S.B. #293721)
COLE & VAN NOTE
555 12th Street, Suite 2100
Oakland, CA, 94607
Tel.:          (510) 891-9800
Email:        lvn@colevannote.com
              mtf@colecvannote.com

Scott J. Falgoust, Esq.
*(PHV Pending)*
BRYSON HARRIS SUCIU & DEMAY PLLC
5301 Canal Boulevard
New Orleans, LA 70124
Tel.:          (919) 585-5634
Email:        sfalgoust@brysonpllc.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WILLIAM MAH, individually and on behalf of all others similarly situated, | Case No.: 2:25-cv-11679 |
| Plaintiff, | **CLASS REPRESENTATION** |
| vs. | [DEMAND FOR JURY TRIAL] |
| THE TEAM COMPANIES, LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff William Mah ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to his and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant The TEAM Companies, LLC  ("TTC" or "Defendant"), and alleges as follows:

1

**<u>INTRODUCTION</u>**

1.    Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against TTC for its failure to secure and safeguard the personally identifiable information ("PII") of Plaintiff and Class Members.

2.    TTC is a California limited liability company that provides commercial payroll, business affairs, and talent payroll services for the entertainment industry. In the regular course of its business, TTC is required to maintain reasonable and adequate security measures to protect its customers' PII against unauthorized access and disclosure.

3.    On July 21, 2025, an unauthorized third party gained access to TTC's network and accessed and obtained files containing PII of Plaintiff and Class Members (the "Data Breach").

4.    TTC owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their PII against unauthorized access and disclosure. TTC breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its customers' PII from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their customers' and employees' data.

5.    TTC required its customers to provide it with sensitive PII and failed to protect it. TTC had an obligation to secure customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between TTC and Plaintiff and Class Members.

CLASS ACTION COMPLAINT

2

6.      As a result of TTC's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.      Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.      Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft, and injunctive relief requiring TTC to ensure that it implements and maintains reasonable data security practices going forward.

## **THE PARTIES**

9.      Plaintiff William Mah is a resident of Port Saint Lucie, Florida, who provided personal information to TTC and received a Notice of Data Breach dated November 21, 2025, concerning TTC's July 2025 incident.

10.      Defendant TTC is a California limited liability company with its principal place of business located in Burbank, California.

/ / /

/ / /

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this controversy under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

12.     For purposes of assessing diversity under 28 U.S.C.§ 1332(d), an unincorporated entity, such as a limited liability company, is "a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C.§ 1332(d)(10).

13.     This Court has jurisdiction over Defendant because its principal place of business is in this District, regularly conducts business in California, and the acts and omissions giving rise to Plaintiff's claims occurred in and arose from this District.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in this District and Defendant's principal place of business is in this District.

**GENERAL ALLEGATIONS**

15.     This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress TTC's willful and reckless violations of his privacy rights. Plaintiff and the other Class Members were customers who contracted with TTC.

16.     Between July 15, 2025, and July 26, 2025, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII.

17.     This action pertains to TTC's unauthorized disclosures of the Plaintiff's PII that occurred during the Data Breach.

/ / /

/ / /

CLASS ACTION COMPLAINT

18.    TTC disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of TTC's failure to safeguard and protect their PII.

19.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, TTC assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting the PII from unauthorized disclosures.

20.    Despite recognizing its duty to do so, TTC failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

21.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on TTC to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### 1. The Data Breach

22.    According to a data breach notification ("Breach Notice") posted on TTC's website, unauthorized access to its network systems occurred between July 15, 2025, and July 26, 2025. During this period, an unauthorized third party accessed client email accounts containing customers' PII, including dates of birth, Social Security numbers, financial account information, credit card/debit card information, medical information, health insurance information, driver's license numbers, and/or other government-issued ID numbers.

23.    Upon detecting the unauthorized activity on July 21, 2025, Defendant initiated an investigation and found that between July 15, 2025, and July 26, 2025, certain client-related files had been accessed and copied by an unauthorized actor. Beginning in November 2025, Defendant began notifying their clients about which individuals and specific data may have been involved in the Data Breach.

/ / /

/ / /

CLASS ACTION COMPLAINT

24. The Breach Notice posted on TTC's website did not specify detailed measures or actions taken by TTC to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

**2. *The Data Breach was Preventable***

25. Had TTC maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded individuals' data. TTC's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

26. TTC was at all times fully aware of its obligation to protect customers' PII and the risks associated with failing to do so. TTC knew that information of the type collected, maintained, and stored by TTC is highly coveted and a frequent target of hackers.

27. This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



/ / /

/ / /

28.    By 2013, it was being reported that nearly one out of four data breach notification recipients became a victim of identity fraud.[1]

29.    Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

30.    When malicious actors infiltrate companies and copy and exfiltrate the PII those companies store, the stolen information often ends up on the dark web, where it is bought and sold for profit.[2]

31.    In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

32.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

33.    In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office on May 26, the firm said it detected unauthorized

---

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).
[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.
[3] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide
s/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[4] *Id.*

access to its systems on March 6, with some systems found to be infected with malicious code . . . According to MCNA, the hackers were successful in accessing patients' personal information."[5]

34.     In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

35.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

36.     Another example is the U.S. Department of Justice's seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash in [PII] belonging to victims from countries around the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

---

[5] *Id.*
[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[7] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites /default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.
[8]     *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramificati ons-identity-theft-fraud-dark-web/.

CLASS ACTION COMPLAINT

37.    The PII of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

38.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

/ / /

---

[9] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[10] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc
26db2.

[11] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

[12] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION,  Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

39.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

40.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

41.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

42.     The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[14]

43.     Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as

---

[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-person al-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

CLASS ACTION COMPLAINT

10

PII from family, friends, and colleagues of the original victim.

44.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

45.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

46.    Data breaches facilitate identity theft as hackers obtain consumers' PII and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' PII to others who do the same.

47.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[16]

48.    The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

---

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[16] *Id.*

CLASS ACTION COMPLAINT

### 3. TTC Failed to Comply with the Federal Trade Commission

49.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

50.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[18] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

51.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

52.     Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses

---

[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[19] *Id.*

[20] FEDERAL TRADE COMMISSION, *supra* note 17.

CLASS ACTION COMPLAINT

for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### 4. *The Impact of Data Breach on Victims*

53.    TTC's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

54.    The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

55.    Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

CLASS ACTION COMPLAINT

56.    Given the confirmed exfiltration of individuals' PII from TTC, many victims of the Data Breach have likely already experienced significant harms as a result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

57.    It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[21]

58.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive

---

[21] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

behaviors.[22]

59.    Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

60.    The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[23]

61.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches.

---

[22] *Id.*

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

CLASS ACTION COMPLAINT

15

Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

62.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

    a.   The unconsented disclosure of confidential information to a third party;

    b.   Unauthorized use of their PII without compensation;

    c.   Losing the value of the explicit and implicit promises of data security;

    d.   Losing the value of access to their PII permitted by TTC without their permission;

    e.   Identity theft and fraud resulting from the theft of their PII;

    f.   Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    g.   Anxiety, emotional distress, and loss of privacy;

    h.   The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

    i.   Unauthorized charges and loss of use of and access to their accounts;

    j.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

    k.   Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to

mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.   The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

63.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims reported spending an average of about 7 hours clearing up the issues relating to identity theft or fraud.[24]

64.   Plaintiff and Class Members place significant value on data security. According to a survey conducted by cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or  important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[25]

65.   Plaintiff and Class Members have a direct interest in TTC's promises and duties to protect PII, i.e., that TTC would *not increase* their risk of identity theft and fraud. Because TTC failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection

---

[24] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[25] Richard Turner, *Beyond the Bottom Line:  The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

CLASS ACTION COMPLAINT

services to compensate them for the present harm and present and continuing increased risk of harm caused by TTC's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for TTC's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

66.    Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through TTC's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

67.    Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as TTC continues to hold their PII.

## CLASS ACTION ALLEGATIONS

68.    Pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed Class Members.

CLASS ACTION COMPLAINT

69. Plaintiff seeks certification of the Nationwide Class and the California Sub-Class defined as follows:

**Nationwide Class**

All persons in the United States whose personal information was accessed in the data breach involving The TEAM Companies, LLC that occurred between about July 15, 2025, and July 26, 2025, and who received a Notice of Data Breach dated on or about November 2025.

**California Sub-Class**

All persons in the State of California whose personal information was accessed in the data breach involving The TEAM Companies, LLC that occurred between about July 15, 2025, and July 26, 2025, and who received a Notice of Data Breach dated on or about November 2025.

70. Excluded from the proposed Classes are any officer or director of TTC; any officer or director of any affiliate, parent, or subsidiary of TTC; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

71. **Numerosity.** Plaintiff does not know the exact number of Class Members, but believes the Classes comprise approximately 21,936 individuals throughout the United States. As such, Class Members are so numerous that joinder of all members is impracticable. Membership in the Class is readily ascertainable from TTC's own records.

72. **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

       a.    Whether TTC engaged in the wrongful conduct alleged herein;

       b.    Whether TTC's inadequate data security measures were a cause

1          of the Data Breach;

2          c.      Whether TTC owed a legal duty to Plaintiff and the other Class

3                  Members to exercise due care in collecting, storing, and

4                  safeguarding their PII;

5          d.      Whether TTC negligently or recklessly breached legal duties

6                  owed to Plaintiff and the Class Members to exercise due care in

7                  collecting, storing, and safeguarding their PII;

8          e.      Whether Plaintiff and the Class are at an increased risk for

9                  identity theft because of the Data Breach;

10         f.      Whether TTC failed to implement and maintain reasonable

11                 security procedures and practices for Plaintiff's and Class

12                 Members' PII;

13         g.      Whether Plaintiff and the other Class Members are entitled to

14                 equitable relief, including, but not limited to, injunctive relief

15                 and restitution.

16         73.     TTC engaged in a common course of conduct giving rise to the legal

17   rights sought to be enforced by Plaintiff, individually, and on behalf of the other

18   Class Members. Similar or identical statutory and common violations, business

19   practices, and injuries are involved. Individual questions, if any, pale by comparison,

20   in both quantity and quality, to the numerous questions that dominate this action.

21         74.     **Typicality:** Plaintiff's claims are typical of the claims of the Members

22   of the Class. All Class Members were subject to the Data Breach and had their PII

23   accessed by and/or disclosed to unauthorized third parties. TTC's misconduct

24   affected all Class Members in the same manner.

25         75.     **Adequacy of Representation:** Plaintiff is an adequate representative of

26   the Class because his interests do not conflict with the interests of the other Class

27   Members they seek to represent; they have retained counsel competent and

28   experienced in complex class action litigation, and Plaintiff will prosecute this action

CLASS ACTION COMPLAINT

vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

76.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against TTC, making it impracticable for Class Members to individually seek redress for TTC's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

**(On Behalf of Plaintiff and the Nationwide Class Against Defendant)**

77.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

78.    Plaintiff brings this claim individually and on behalf of the Class.

79.    TTC owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII in TTC's possession was adequately secured and protected.

CLASS ACTION COMPLAINT

80. TTC owed, and continues to owe, a duty to Plaintiff and the other Class Members to safeguard and protect their PII.

81. TTC breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII.

82. It was reasonably foreseeable that TTC's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII would result in an unauthorized third-party gaining access to such information for no lawful purpose.

83. As a direct result of TTC's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and the member of the Class's confidential information, Plaintiff and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

84. By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access TTC's systems containing the PII at issue, TTC failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which TTC has failed to do as discussed herein.

85. TTC's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

86. Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

87. TTC's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

88.     As a result of TTC's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in TTC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**

**<u>NEGLIGENCE <em>PER SE</em></u>**

**(On Behalf of Plaintiff and the Nationwide Class Against Defendant)**

89.     Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

90.     Plaintiff brings this claim individually and on behalf of the Class.

91.     Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information.

92.     Pursuant to Cal. Civ. Code § 56 et seq., Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' Personal Information.

93.     Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act (15 U.S.C. § 45) and Cal. Civ. Code § 56 et seq. by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information.

94.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

95.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

96.    The injury and harm suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

97.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members now face an increased risk of future harm.

98.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT III

## <u>BREACH OF CONTRACT</u>

### (On Behalf of Plaintiff and the Class Against Defendant)

99.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

100.    Plaintiff brings this claim individually and on behalf of the Nationwide Class.

101.    Plaintiffs and Class Members entered into a valid and enforceable contract through which they were required to turn over their sensitive personal information to Defendant in exchange for Defendant's services.

102.    That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiffs' and Class Members' sensitive personal information to any third parties without their consent.

CLASS ACTION COMPLAINT

24

103.    Pursuant to these contracts, the Plaintiffs and Nationwide Class paid money to TTC and provided TTC with their Private Information. In exchange, TTC agreed to, among other things: (1) provide payroll services relating to Plaintiffs and Nationwide Class; (2) use Plaintiffs' and Nationwide Class's Private Information to facilitate providing payroll services involving Plaintiffs and Nationwide Class; (3) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Nationwide Class's Private Information; and (4) protect Plaintiffs' and Nationwide Class's Private Information in compliance with federal and state laws and regulations, industry standards, and TTC's representations regarding its security and privacy practices.

104.    The protection of Private Information was a material term of the contracts between Plaintiffs and TTC. Had Plaintiffs and Nationwide Class known that TTC would not adequately protect their Private Information, they would not have paid for or obtained payroll services from TTC.

105.    TTC breached its obligations under the contracts with Plaintiff and the Nationwide Class in failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Nationwide Class's Private Information, and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Nationwide Class's Private Information in a manner that complies with applicable laws, regulations, and industry standards.

106.    TTC's breach of its obligations with Plaintiffs and Nationwide Class directly resulted in the Data Breach and the resulting injuries to Plaintiffs and Nationwide Class.

107.    Plaintiffs and Nationwide Class were damaged by TTC's breach of contract because: (i) they now face a substantially increased and imminent risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their Private Information was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their

Private Information has been breached; (v) they were deprived of the value of their Private Information, for which there is a well-established national and international market; and (v) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

**COUNT IV**

**<u>BREACH OF IMPLIED CONTRACT</u>**

**(On Behalf of Plaintiff and the Nationwide Class Against Defendant)**

108.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

109.    Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

110.    Defendant solicited, invited, and required Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

111.    As a condition of being direct customers and/or employees of Defendant, Plaintiff and Class Members provided and entrusted their Private Information to Defendant. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such non-public information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached, compromised, or stolen.

112.    A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Private Information to Defendant in exchange for, among other things, the protection of their Private Information.

CLASS ACTION COMPLAINT

113.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

114.    Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely and accurate notice that their Private Information was compromised as a result of the Data Breach.

115.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered and will continue to suffer (i) ongoing, imminent, and impending threat of identity theft, fraud, and abuse resulting in monetary loss and economic harm; (ii) actual identity theft, fraud, and abuse resulting in monetary loss and economic harm; (iii) loss of the confidentiality of the stolen confidential data; (iv) the illegal sale of the compromised data on the dark web; (v) lost work time; and (vi) other economic and noneconomic harm.

**COUNT V**

**CALIFORNIA UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(On Behalf of Plaintiff and the California Class Against Defendant)**

116.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

117.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

118.    Defendant violated Cal. Bus. & Prof. Code § 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

119.    Defendant's "unfair" acts and practices include:

/ / /

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

   a. Failing to maintain reasonable data-security measures to protect Plaintiff's and Class Members' Private Information from unauthorized access, which directly caused the Data Breach and resulting harm;

   b. Failing to use safeguards consistent with public policy requiring businesses to protect consumers' data, including policies embodied in the Federal Trade Commission Act, 15 U.S.C. § 45, *et seq.*;

   c. Causing substantial consumer injury through inadequate security practices that provided no offsetting benefit to consumers or competition and could not reasonably have been avoided; and

   d. Violating Cal. Civ. Code § 1798.82 by failing to provide timely and adequate breach notification.

120.   Defendant has also engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumers Legal Remedies Act, Cal. Civ. Code § 1780, et seq., the FTC Act, 15 U.S.C. § 45, et seq., and California common law.

121.   Defendant's unlawful, unfair, and deceptive acts and practices include:

   a. Failing to establish and enforce adequate data security and privacy safeguards to protect Plaintiff's and Class Members' Private Information, which directly and proximately caused the Data Breach;

   b. Neglecting to anticipate and address foreseeable cybersecurity threats, correct known vulnerabilities, and maintain or strengthen protective measures, thereby directly contributing to the Data Breach;

   c. Disregarding duties imposed by common law and statute—

including those set forth under the FTC Act, 15 U.S.C. § 45, et seq.—to properly secure and preserve the confidentiality of Plaintiff's and Class Members' Private Information;

d. Misrepresenting that Defendant had implemented appropriate practices to ensure the privacy and confidentiality of Plaintiff's and Class Members' Private Information;

e. Misrepresenting compliance with applicable legal and regulatory obligations concerning data security and privacy, including those established under the FTC Act, 15 U.S.C. § 45, et seq.;

f. Concealing and failing to disclose the material fact that Defendant did not maintain adequate or reasonable data-security systems to protect Plaintiff's and Class Members' Private Information; and

g. Concealing and failing the material fact that Defendant failed to adhere to its common law and statutory duties relating to the protection and privacy of Plaintiff's and Class Members' Private Information, including obligations imposed by the FTC Act, 15 U.S.C. § 45, et seq.

122.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and its ability to protect the confidentiality of consumers' Private Information.

123.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members were injured and lost money or property, including: (i) the price paid to Defendant for goods and services; (ii) monetary damages from fraud and identity theft; (iii) time and expenses incurred monitoring financial accounts for fraudulent activity; (iv) an increased and imminent risk of fraud and identity theft; and (v) loss of the value of their Private Information.

/ / /

CLASS ACTION COMPLAINT

124.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law and recklessly disregarded Plaintiff's and Class Members' rights.

125.    Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits obtained through Defendant's unfair, unlawful, and fraudulent business practices or use of their Private Information, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and all other appropriate equitable relief.

**COUNT VI**

**<u>VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT</u>**

**Cal. Civ. Code §§ 1750, et seq.**

**(On Behalf of Plaintiff and the California Class Against Defendant)**

126.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

127.    The Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction that results in the sale or lease of goods or services to a consumer. *See* Cal. Civ. Code § 1770(a). The purpose of the CLRA is "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760.

128.    Plaintiff and Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d), as they sought and received payroll and related services from Defendant. Defendant's provision of payroll services constitutes "services" within the meaning of Cal. Civ. Code § 1761(b), and Defendant's interactions with customers constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

129.    Defendant violated and continues to violate the CLRA by engaging in the following unfair and deceptive acts and practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and Class Members:

    a.  Representing that services have sponsorship, approval, characteristics, uses, benefits, or qualities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

    b.  Using deceptive representations or designations in connection with the provision of services; and

    c.  Advertising services with the intent not to provide them as represented.

130.    Specifically, Defendant misrepresented and omitted material facts regarding the privacy, confidentiality, and security of customers' Private Information. Defendant represented, through its website, privacy notices, and other communications, that it would safeguard and protect customers' personal data in compliance with privacy laws, while failing to maintain reasonable and appropriate data security practices to prevent unauthorized access and disclosure.

131.    Defendant further failed to disclose material facts that a reasonable consumer would consider important, including that its data security systems were outdated, inadequately monitored, and insufficient to protect customers' private information from unauthorized intrusion.

132.    Defendant's representations and omissions were false, misleading, and likely to deceive reasonable consumers into believing that their personal information would remain private and secure when using Defendant's services.

133.    Plaintiff and Class Members reasonably relied on Defendant's representations and omissions in deciding to provide their Private Information and obtain payroll services from Defendant. Had they known the truth, they would not have entrusted their Private Information to Defendant or would have taken additional

CLASS ACTION COMPLAINT

31

precautions to safeguard themselves.

134.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and Class Members suffered injury and damages, including loss of privacy, diminution in the value of their Private Information, the risk of identity theft and fraud, and the time and expense of mitigating the effects of the Data Breach.

135.    Plaintiff seeks only injunctive relief under the CLRA. Pursuant to Cal. Civ. Code § 1782, Plaintiff will provide Defendant with written notice of the alleged violations and an opportunity to correct, repair, replace, or otherwise rectify the unlawful practices described herein. Should Defendant fail to do so within the statutory period following receipt of such notice, Plaintiff will amend this Complaint to seek all damages and other relief permitted under the CLRA, including actual, statutory, and punitive damages.

## COUNT VII

## <u>VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")</u>

**(On Behalf of Plaintiff and the California Subclass Against Defendant)**

136.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

137.    At all relevant times, defendant was a "business" as defined in Cal. Civ. Code § 1798.140(c), and Plaintiff and the California Subclass Members were "consumers" as defined in Cal. Civ. Code § 1798.140(g).

138.    The PII collected and stored by TTC constitutes "personal information" as defined in Cal. Civ. Code. Sec. 1798.81.5, including but not limited to names and driver's license numbers.

139.    The CCPA, Cal. Civ. Code § 1798.150(a) provides a private right of action for any consumer whose nonencrypted or nonredacted personal information is subject to unauthorized access, exfiltration, theft, or disclosure as a result of a business's violation of its duty to implement and maintain reasonable security

CLASS ACTION COMPLAINT

procedures and practices.

140.    TTC failed to implement and maintain reasonable security practices and procedures appropriate for protecting personal information from unauthorized access, exfiltration, and disclosure, in violation of Cal. Civ. Code § 1798.150(a).

141.    As a direct and proximate result of TTC's violations of the CCPA, the personal information of Plaintiff and the California Subclass Members was compromised in the Data Breach.

142.    Concurrently with the filing of this complaint, Plaintiff William Mah is serving TTC with the notice required by Cal. Civ. Code § 1798.150(b) and will amend this complaint to allege a claim for statutory damages when the 30-day notice period expires. Presently, Plaintiff William Mah seeks injunctive relief to ensure TTC implements and maintains reasonable security procedures to protect the private information of the California Subclass Members.

**COUNT VIII**

**<u>VIOLATION OF THE CALIFORNIA CONSUMER RECORDS ACT</u>**

**(Cal. Civ. Code. Sec. 1798.80, et seq.)**

**(on behalf of Plaintiff William Mah and the California Subclass)**

143.    Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

144.    At all relevant times, defendant was a "business" that owns or licenses computerized data that includes personal information, as defined by Cal. Civ. Code § 1798.81.5(d)(1). The Private Information at issue here includes "personal information" as defined in Cal. Civ. Code § 1798.80(e).

145.    The California Customer Records Act ("CRA") requires businesses to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect it from unauthorized access, destruction, use, modification, or disclosure. Cal. Civ. Code § 1798.81.5(b).

146.    TTC failed to implement and maintain such reasonable security procedures and practices. As a result of TTC's violation of § 1798.81.5, Plaintiff

William Mah's and the California Subclass Members' personal information was stolen by cybercriminals/hackers.

147.    The CRA requires that any business that maintains personal information subject to a security breach must disclose the breach as soon as possible and without unreasonable delay. Cal. Civ. Code § 1798.82(a). TCC failed to disclose the Data Breach to Plaintiff William Mah and the California Subclass Members without unreasonable delay, waiting months after discovery of the Data Breach to begin notifying impacted individuals.

148.    As a direct and proximate result of TTC's violations of the CRA, Plaintiff William Mah and the California Subclass Members have suffered damages as alleged herein and seek all remedies available under Cal. Civ. Code §§ 1798.84(b), including compensatory damages, injunctive relief, and attorneys' fees and costs.

## COUNT IX

## UNJUST ENRICHMENT

**(On Behalf of Plaintiff and the Nationwide Class Against Defendant)**

149.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

150.    Plaintiff and Class Members conferred a monetary benefit upon TTC in the form of payments for payroll or related services, with an implicit understanding that TTC would use some of these payments to protect the PII they collect, store, and use to process payroll.

151.    TTC accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. TTC also benefited from the receipt of Plaintiff's and Class Members' PII, as this was used to facilitate payroll services and other aspects of TTC's business.

152.    As a result of TTC's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between its payments

made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

153.    TTC should not be permitted to retain the money belonging to Plaintiff and the Class Members because TTC failed to adequately implement the data privacy and security procedures that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

154.    TTC should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT X**

**DECLARATORY AND INJUNCTIVE RELIEF**

**(On Behalf of Plaintiff and the Nationwide Class Against Defendant)**

155.    Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

156.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

157.    An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiffs allege Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury from the ongoing threat of additional fraud against them or on their accounts.

/ / /

CLASS ACTION COMPLAINT

158.    Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendant owed, and continues to owe, a legal duty to employ reasonable data security to secure the Private Information it possesses, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

    b. Defendant breached, and continues to breach, its duty by failing to employ reasonable measures to secure its customers' personal and financial information; and

    c. Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class.

159.    The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its customers' (i.e., Plaintiff and Class Members') data.

160.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable.

161.    An injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

/ / /

CLASS ACTION COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against TTC, as follows:

      a.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

      b.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

      c.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent TTC from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

      d.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

      e.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

      f.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

# **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.


Dated: December 9, 2025                    Respectfully submitted,


*/s/ Laura Van Note*
Laura Van Note, Esq. (S.B. #310160)
Mark T. Freeman, Esq. (S.B. #293721)
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, CA, 94607
Tel.:          (510) 891-9800
Email:        lvn@colevannote.com
              mtf@colecvannote.com

Scott J. Falgoust, Esq.
*(PHV Pending)*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
Tel.:          (919) 585-5634
Email:        sfalgoust@brysonpllc.com

*Attorneys for Plaintiff and the Proposed Class*